UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JORGE SANGUINETTI,

    Plaintiff,

v.

                                            Case No.: 2:21-cv-529-JLB-KCD

COLLIER COUNTY, KEVIN RAMBOSK,
ADAM DILLMAN, JOHN SCADUTO,
DAVID DRUCKS, MICHAEL PUKA,
and DAVID CRISP, JR.,

    Defendants.

_____/

## **ORDER**

This matter is before the Court on two motions for summary judgment (Docs. 179, 180).  The first motion was filed by Defendants John Scaduto ("Deputy Scaduto"), David Drucks ("Mr. Drucks"), Michael Puka ("Mr. Puka"), and David Crisp, Jr. ("Mr. Crisp").  (Doc. 179).  Plaintiff Jorge Sanguinetti ("Plaintiff" or "Mr. Sanguinetti") filed a response (Doc. 199), Defendants filed a reply (Doc. 201), and Plaintiff filed a sur-reply (Doc. 211)[1].  The second summary judgment motion was filed by defendants Collier County, Kevin Rambosk ("Mr. Rambosk"), and Adam Dillman ("Mr. Dillman").  (Doc. 180).  Plaintiff filed a response (Doc. 198), and defendants filed a reply (Doc. 200).[2]

---

[1] Mr. Sanguinetti filed a motion for leave to file this sur-reply, which the Court granted. (Docs. 205, 210).

[2] After Defendants filed their respective replies, Mr. Sanguinetti filed a Notice of

1

After careful review of the record and entire file, the Motion for Summary

Judgment filed by Deputy Scaduto, Mr. Drucks, Mr. Puka, and Mr. Crisp (Doc. 179)

is **GRANTED,** and the Motion for Summary Judgment filed by Collier County, Mr.

Rambosk, and Mr. Dillman is (Doc. 180) **GRANTED**.

## BACKGROUND

On the evening of Friday, July 14, 2017, Mr. Sanguinetti and three of his

friends embarked on a night out in Naples, Florida, to celebrate a birthday.  (Doc.

173-1 at 40:12–42:12; Doc. 180 at ¶ 1; Doc. 198 at ¶ 1).  The group began at a

restaurant called Dylan's, where they ordered a pitcher of beer.  (Doc. 173-1 at

55:13–16; Doc. 179 at ¶ 3; Doc. 180 at ¶ 1; Doc. 198 at ¶ 1; Doc. 199 at ¶ 3).  The

group later moved to the Blue Martini, located in a Naples outdoor mall called

Mercato.  (Doc. 173-1 at 52:8–15, 55:17–56:1; Doc. 179 at ¶ 3; Doc. 180 at ¶ 3; Doc.

198 at ¶ 3; Doc. 199 at ¶ 3).  At Blue Martini, each of the friends ordered a Corona

beer.  (*Id.*).  The group eventually landed at the Cavo Lounge, which was also

located at Mercato.  (Doc. 173-1 at 52:17–53:18; Doc. 179 at ¶ 4; Doc. 180 at ¶ 3;

Doc. 198 at ¶ 3; Doc. 199 at ¶ 4).  The events leading to this litigation unfolded

---

Clarification (Doc. 202).  Mr. Sanguinetti claims that this notice merely seeks to correct
scrivener's errors in his responses (Docs. 198, 199).  But in actuality, the notice is a sur-
reply that seeks to remediate the deficiencies alleged in defendants' replies by citing to
additional record evidence.  Mr. Sanguinetti may not evade this district's local rules by
styling what is in its essence a sur-reply as a notice.  The Middle District of Florida's Local
Rules do not permit parties to file sur-replies without leave of court.  *See* M.D. Fla. Loc. R.
3.01(c) (explaining that a party responding to a motion is permitted to file a single
memorandum of no longer than twenty pages inclusive of all parts); M.D. Fla. Loc. R.
3.01(e) (explaining that, absent narrow exceptions, no party may reply without leave of
court).  As such, the Clerk of Court is hereby **DIRECTED** to **STRIKE** Mr. Sanguinetti's
Notice of Clarification (Doc. 202).

when Mr. Sanguinetti and his friends attempted to enter the Cavo Lounge.

Defendants Mr. Drucks, Mr. Crisp, and Mr. Puka were road patrol officers with the Collier County Sheriff's Office. (Doc. 173-9 at 3:12–4:3). On the evening of the events leading to this litigation, they were on assignment to patrol the Mercato area. (*Id.*; Doc. 179 at ¶ 41; Doc. 199 at ¶ 41). Their assignment consisted of patrolling and aiding bouncers within the area surrounding the Cavo Lounge. (Doc. 173-9 at 4:9–5:3). Defendant Deputies Scaduto and Dillman were detectives working in the gang unit of the Collier County Sheriff's Office. (Doc. 173-5 at 4:13–5:7; Doc. 180 at ¶ 4; Doc. 198 at ¶ 4). Deputies Scaduto and Dillman were on patrol in Mercato that evening to maintain a law enforcement presence following recent violent events in the area. (*Id.*). They were not working on any special contract detail between the Sheriff's Office and Mercato establishments. (Doc. 180 at ¶ 4; Doc. 180-1 at ¶ 6; Doc. 198 at ¶ 4). Defendant Sheriff Rambosk, the Sheriff of Collier County, had no personal involvement in the events that occurred that evening and was unaware of them until being served with the lawsuit. (Doc. 180 at ¶ 23; Doc. 180-4 at ¶ 3; Doc. 198 at ¶ 23). Defendant Collier County defines the geographic limitations of the law enforcement function of the Collier County Sheriff's Office but otherwise exercises no control over the Sheriff's law enforcement function. (Doc. 180-5 at ¶ 4). Collier County plays no role in the selection or hiring of deputies by the Sheriff, in the training of deputies, or in the development of the Sheriff's Office policies as they relate to training or discipline. (*Id.* at ¶ 5).

When Mr. Sanguinetti and his friends attempted to enter the Cavo Lounge,

3

they were denied entry because they did not comply with the lounge's dress code. (Doc. 179 at ¶ 9; Doc. 180 at ¶ 7; Doc. 198 at ¶ 7; Doc. 199 at ¶ 9).  Additionally, Cavo Lounge employees believed that Mr. Sanguinetti and his friends were intoxicated (Doc. 179 at ¶ 10; Doc. 180 at ¶ 7; Doc. 198 at ¶ 7; Doc. 199 at ¶ 10), though Mr. Sanguinetti denies that he was visibly intoxicated at this time (Doc. 173-1 at 56:5–6).

An unidentified employee at the lounge's entrance said, "Why don't you get the fuck out of here?"  (Doc. 179 at ¶¶ 5, 8; Doc. 180 at ¶ 5; Doc. 198 at ¶ 5; Doc. 199 at ¶¶ 5, 8).  Mr. Sanguinetti then asked to speak to a manager.  (Doc. 179 at ¶ 15; Doc. 180 at ¶ 5; Doc. 198 at ¶ 5; Doc. 199 at ¶ 15).  Deputy Scaduto approached and asked if everything was okay, to which Mr. Sanguinetti responded affirmatively, and Deputy Scaduto then left.  (Doc. 179 at ¶ 16; Doc. 180 at ¶ 5; Doc. 198 at ¶ 5; Doc. 199 at ¶ 16).  Mr. Sanguinetti was aware that Deputy Scaduto was a police officer at this time.  (Doc. 179 at ¶ 17; Doc. 199 at ¶ 17).

The Cavo Lounge manager, Jason Buro ("Mr. Buro"), approached the group and told them to "get the fuck out of here" because they were starting to cause a scene.  (Doc. 179 at ¶ 11; Doc. 180 at ¶ 6; Doc. 198 at ¶ 6; Doc. 199 at ¶ 11).  Mr. Sanguinetti was the only member of the group who spoke English.  (Doc. 179 at ¶ 1; Doc. 199 at ¶ 1).  Anticipating a language barrier, Mr. Buro gestured to his shirt collar in an attempt to communicate that there was a dress code issue.  (Doc. 173-3 at 7:2–14; Doc. 179 at ¶ 24; Doc. 199 at ¶ 24).  According to Mr. Buro, Mr. Sanguinetti then reached out and grabbed Mr. Buro's shirt collar.  (Doc. 173-3 at

14:15–21; Doc. 180 at ¶ 8). Mr. Sanguinetti denies that he grabbed Mr. Buro's shirt collar at any point. (Doc. 198 at ¶ 8; Doc. 198-2 at 38:22–25).

Mr. Buro then asked the uniformed officers for help and to escort Mr. Sanguinetti and his friends away from the front of the Cavo Lounge. (Doc. 179 at ¶ 11; Doc. 199 at ¶ 11). Deputy Dillman escorted at least some members of the group away to the valet area. (Doc. 179 at ¶ 12; Doc. 180 at ¶ 11; Doc. 198 at ¶ 11; Doc. 199 at ¶ 12).

Deputy Scaduto returned to the Cavo Lounge. (Doc. 179 at ¶ 28; Doc. 199 at ¶ 28). Upon his return, Deputy Scaduto gave Mr. Sanguinetti a soft touch with his left hand to guide him to leave and verbally instructed Mr. Sanguinetti to leave.[3] (Doc. 179 at ¶ 32; Doc. 179-1 at 0:00:20–22). According to Defendants, Mr. Sanguinetti responded by shoving Deputy Scaduto's upper left torso with one hand, causing Deputy Scaduto to lose his balance slightly. (Doc. 179 at ¶ 34; Doc. 179-1 at 0:00:21–24; Doc. 180 at ¶ 14). Mr. Sanguinetti denies that he shoved Deputy Scaduto. (Doc. 198 at ¶ 14; Doc. 199 at ¶ 34).

Deputy Scaduto then shoved Mr. Sanguinetti with both hands. (Doc. 179 at ¶ 35; Doc. 179-1 at 0:00:23–25; Doc. 180 at ¶ 14; Doc. 198 at ¶ 14; Doc. 199 at ¶ 35).

---

[3] In his response to Defendants' summary judgment motions, Mr. Sanguinetti insists that he was never asked to leave by any officer or employee, including Mr. Scaduto (Doc. 198 at ¶ 11; Doc. 199 at ¶ 32), but in his Fourth Amended Complaint, Mr. Sanguinetti specifically alleges that "[u]pon arriving at the entrance of Cavo, [D]efendants [Mr.] Dillman and [Mr.] Scaduto immediately . . . scream[ed] . . . orders at [Mr. Sanguinetti] to vacate the premises." (Doc. 149 at ¶ 38). The Court will not consider Mr. Sanguinetti's attempt to amend his complaint through responses to the motions for summary judgment. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

While Mr. Sanguinetti staggered backwards, his hands were out to the sides of his body. (Doc. 179-1 at 0:00:24–27). Deputy Dillman believed that Mr. Sanguinetti was going to strike Deputy Scaduto. (Doc. 173-5 at 13:22–23).

Deputy Dillman quickly intervened by grabbing Mr. Sanguinetti and forcibly removing him from the line to enter the Cavo Lounge. (Doc. 179 at ¶ 37; Doc. 179-1 at 0:00:27–29; Doc. 199 at ¶ 37). The parties dispute whether Mr. Sanguinetti punched Deputy Dillman at this time, but video evidence demonstrates that, at a minimum, Mr. Sanguinetti's hands were raised while he was facing Deputy Dillman. (Doc. 179-1 at 0:00:27–30; Doc. 180 at ¶ 15; Doc. 198 at ¶ 15). Deputy Dillman then took Mr. Sanguinetti to the ground by punching him. (Doc. 179-1 at 0:00:29–31; Doc. 179 at ¶ 38; Doc. 199 at ¶ 38).

Deputies Drucks and Puka approached while this was occurring. (Doc. 179-1 at 0:00:26–0:00:37). By the time Deputy Crisp reached the altercation, Mr. Sanguinetti was already on the ground. (Doc. 179-1 at 0:00:30–0:01:58). Because a crowd was forming, Deputy Crisp took a perimeter position facing the crowd, which significantly limited the extent to which he could observe the altercation. (Doc. 179 at ¶¶ 44–46; Doc. 179-1 at 0:00:30–0:01:58; Doc. 199 at ¶¶ 44–46).

Defendants allege that Mr. Sanguinetti was a large man and that he was resisting and flailing on the ground. (Doc. 173-3 at 17:23–18:9; Doc. 173-8 at 6:1–16; Doc. 179 at ¶¶ 47, 50; Doc. 180 at ¶ 16). Mr. Sanguinetti denies that he flailed or resisted. (Doc. 198 at ¶ 16; Doc. 199 at ¶¶ 47, 50). Deputy Dillman delivered strikes to Mr. Sanguinetti while the other officers attempted to get Mr.

Sanguinetti's arms from underneath him. (Doc. 179 at ¶ 54). Deputy Scaduto then delivered one burst of Oleoresin Capsicum spray (colloquially known as "pepper spray") to Mr. Sanguinetti's face. (Doc. 179 at ¶ 55; Doc. 199 at ¶ 55). Deputy Scaduto thereafter deployed a single taser shot in prong mode while Mr. Sanguinetti was on the ground. (Doc. 179 at ¶ 59; Doc. 199 at ¶ 59).

Mr. Sanguinetti stood up from the ground before Deputy Drucks took him back to the ground again. (Doc. 179 at ¶¶ 61–62; Doc. 199 at ¶¶ 61–62). Deputy Dillman was then able to attach a handcuff to one of Mr. Sanguinetti's wrists. (Doc. 179 at ¶ 64; Doc. 199 at ¶ 64). Deputy Dillman twisted the attached handcuff in an effort to get Mr. Sanguinetti's other hand out. (Doc. 179 at ¶ 65; Doc. 199 at ¶ 65). Once Mr. Sanguinetti was handcuffed, he was placed inside Deputy Crisp's vehicle. (Doc. 179 at ¶¶ 66–67; Doc. 199 at ¶¶ 66–67).

Deputy Scaduto was the arresting officer. (Doc. 179 at ¶ 69; Doc. 199 at ¶ 69). He arrested Mr. Sanguinetti for battery on a law enforcement officer, resisting an officer with *and* without violence, disorderly intoxication, and trespass. (*Id.*; Doc. 173-12 at 3).[4]

During Mr. Sanguinetti's jail intake medical screening, no visible signs of serious injury were noted. (Doc. 173-13 at 4; Doc. 179 at ¶ 71). Mr. Sanguinetti's jail intake medical screening notes state that he complained of discomfort in his

---

[4] The State of Florida subsequently filed an Information only on the charges of battery of a law enforcement officer and resisting an officer with and without violence. (Doc. 173-12 at 1; Doc. 179 at ¶ 70; Doc. 199 at ¶ 70).

right thumb and numbness. (Doc. 173-13 at 5; Doc. 179 at ¶ 72; Doc. 199 at ¶ 72). They also noted that, when asked whether Mr. Sanguinetti had a head injury or loss of consciousness in the past 72 hours, Mr. Sanguinetti answered, "No." (Doc. 173-13 at 5; Doc. 179 at ¶ 73; Doc. 199 at ¶ 73). The screening notes evidence of skin injury, including bruises and abrasions. (Doc. 173-13 at 5; Doc. 179 at ¶ 74; Doc. 199 at ¶ 74). The photographic and videographic evidence of Mr. Sanguinetti after the altercation does not depict any further injury. (Doc. 179 at ¶ 75; Doc. 199 at ¶ 75; *see* Doc. 173-14; Doc. 179-2).

Mr. Sanguinetti initially filed suit in this Court on July 15, 2021. (Doc. 1) (the "Initial Complaint"). Certain Defendants filed timely motions to dismiss the Initial Complaint (Docs. 7–8) ("Defendants' Motions to Dismiss the Initial Complaint"), and Mr. Sanguinetti missed his response deadline. Because the Eleventh Circuit has a "strong preference that cases be heard on the merits," *Wahl v. McIver*, 773 F.2d 1169, 1174 (11th Cir. 1985), and "strive[s] to afford a litigant his or her day in court, if possible," *Betty K Agencies, Ltd. v. M/V MONADA*, 432 F.3d 1333, 1339 (11th Cir. 2005) (citation omitted); *see Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1342 (11th Cir. 2014), the Court granted Mr. Sanguinetti an additional twelve days to respond to Defendants' Motions to Dismiss the Initial Complaint. (Doc. 23). On the last day of Mr. Sanguinetti's extended deadline, he filed an Unopposed Motion for Extension of Time to Respond. (Doc. 24). The Court granted the motion and allowed Mr. Sanguinetti an additional *two weeks* to respond. (Doc. 25). Mr. Sanguinetti *again missed his response deadline* and filed his responses out

8

of time. (*See* Docs. 30, 31). The remaining Defendants then filed their own Motion to Dismiss the Initial Complaint (Doc. 51). Mr. Sanguinetti again moved for an extension of time to prepare his response (Doc. 52), which this Court granted (Doc. 53). The Court granted in part all of the motions to dismiss the Initial Complaint (Docs. 7–8, 51) after finding that the Initial Complaint was an impermissible shotgun pleading. (Doc. 67). The Court allowed Mr. Sanguinetti until October 3, 2022, to file an amended complaint. (*Id.*).

Mr. Sanguinetti filed his Amended Complaint on the last day of the deadline. (Doc. 69). Three days later, Mr. Sanguinetti filed an Unopposed Motion to Amend the Amended Complaint (Doc. 70), explaining that his counsel had accidentally filed a working draft of the Amended Complaint rather than the final version. The Court granted this motion. (Doc. 71).

Mr. Sanguinetti filed his Second Amended Complaint on October 6, 2022. (Doc. 72). Defendants filed timely motions to dismiss the Second Amended Complaint (Docs. 79, 81–82) ("Defendants' Motions to Dismiss the Second Amended Complaint"). The Court entered an Order on Defendants' Motions to Dismiss the Second Amended Complaint, and Mr. Sanguinetti was allowed to file a third amended complaint curing deficiencies identified in the Order. (Doc. 122).

Mr. Sanguinetti filed his Third Amended Complaint on September 26, 2023. (Doc. 126). Defendants filed timely answers to the Third Amended Complaint. (Docs. 133–38, 140–43). Mr. Sanguinetti then filed an Unopposed Motion to Amend the Third Amended Complaint (Doc. 147) for the purpose of dismissing certain

9

counts, which this Court granted (Doc. 148).

Mr. Sanguinetti filed his Fourth Amended Complaint, which is now the operative complaint in this case, on October 30, 2023. (Doc. 149). Defendants filed timely answers to the Fourth Amended Complaint. (Docs. 150–59).

Over the next few months, various claims were settled with certain defendants. (Doc. 170). The remaining Defendants filed their respective motions for summary judgment (Docs. 179, 180), which are now ripe for this Court's review.[5]

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is one that "might affect the outcome of the suit under the governing law." *Id.* "[A] mere scintilla of evidence" does not create a genuine issue of material fact, so a nonmoving party may not simply state that "the jury might, and legally could, disbelieve the moving party's evidence." *Hinson v. Bias*, 927 F.3d 1103, 1115–16 (11th Cir. 2019) (citation and internal quotation marks omitted).

Courts may not make credibility determinations or weigh the evidence when reviewing the record. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir.

---

[5] This case was stayed after the filing of Defendants' summary judgment motions to allow the parties to proceed with settlement efforts. (*See* Doc. 222).

10

2010) ("On summary judgment . . . [n]either [the Eleventh Circuit] nor the district court are to undertake credibility determinations or weigh the evidence."). Instead, courts view evidence and draw all reasonable inferences in the nonmoving party's favor. *Rojas v. Florida*, 285 F.3d 1339, 1341–42 (11th Cir. 2002). But "an inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the evidence but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1982). The ultimate question for the Court on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

Both the Supreme Court and the Eleventh Circuit have addressed video evidence in the context of this summary judgment standard. In *Scott v. Harris*, 550 U.S. 372, 378 (2007), the Supreme Court found error in the lower court's reliance on the plaintiff's (there, the non-movant's) version of events because the "videotape quite clearly contradict[ed] the version of the story told by" the plaintiff. After addressing what the videotape showed in that case, the Supreme Court returned to the summary judgment standard and explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts....Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue

11

of *material* fact." When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here concerning the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

*Id.* at 380–81 (citations omitted).

Following *Scott*, the Eleventh Circuit has explained that it views the facts in light of video evidence "to the extent it squarely conflicts with [non-movant's] testimonial descriptions." *Baxter v. Roberts*, 54 F.4th 1241, 1257 (11th Cir. 2022). Indeed, the Eleventh Circuit has stated that it has "repeatedly applied [a] preferencing rule in affirming summary judgment based on objective evidence notwithstanding the presence of some contradictory testimony from the nonmovant elsewhere in the record." *Id.* at 1258 n.12. That said, "where the videos do not answer all the questions or resolve all the details of the encounter, we view the evidence in the light most favorable to [the nonmoving party]." *Johnson v. City of Miami Beach*, 18 F.4th 1267, 1269 (11th Cir. 2021) (citation omitted).

## DISCUSSION

### I.    Mr. Sanguinetti's 42 U.S.C. § 1983 Claims Against the County and Sheriff in His Official Capacity Fail.

Mr. Sanguinetti brings counts IV, V, VII, XII, XIII, XIV, XV, and XVI against the County and Sheriff in his official capacity. (*See* Doc. 149 ¶¶ 142–53, 166–86, 225–60). These are § 1983 claims for false arrest, false imprisonment, excessive

12

force, deprivation of rights and denial of equal protection, general "*Monell*" liability, failure to train or supervise, supervisory liability for failure to correct, and supervisory liability for failure to train.[6]  In § 1983 actions, "Florida sheriffs are county officials as opposed to state officials."  *Hutton v. Strickland*, 919 F.2d 1531, 1542 (11th Cir. 1990).  As a result, where a plaintiff sues the county sheriff in his official capacity, "the suit is effectively an action against the governmental entity he represents."  *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005) (citation omitted).  In this case, Sheriff Rambosk represents Collier County.

Where a plaintiff sues a local entity under 42 U.S.C. § 1983, the plaintiff must show the injury occurred due to that entity's "policy or custom."  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978); *Cook*, 402 F.3d at 1116 ("[O]nly when a 'policy or custom' of the municipality inflicts the injury does § 1983 liability exist." (citation omitted)).  Under *Monell*, a plaintiff must establish "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right;

---

[6] Mr. Sanguinetti brings counts XV and XVI, for supervisory liability for failure to correct and failure to train, against Sheriff Rambosk without specifying whether the claims are against the Sheriff in his individual or official capacity.  (*See* Doc. 149 at 39–41).  Accordingly, the Court analyzes the counts as if they are brought against the Sheriff in both his individual and official capacities.  Because both counts XV and XVI allege failure to correct and failure to train were a result of "policy or custom," they are analyzed under *Monell*.  (Doc. 149 at ¶¶ 248, 256–57).  In any case, such claims require evidence that "without notice of a need to train or supervise in a particular area," a plaintiff cannot demonstrate liability for failure to do so.  *Gold v. City of Miami*, 151 F.3d 1346, 1351 (11th Cir. 1998).  Mr. Sanguinetti has presented no plausible argument or any record evidence of such notice.

and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

The Court's "first inquiry in any case alleging municipal liability under § 1983 is . . . whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). "[T]he custom or policy must be the 'moving force' behind the constitutional deprivation for there to be sufficient causation." *Marantes v. Miami-Dade Cnty.*, 649 F. App'x 665, 672 (11th Cir. 2016) (quoting *Monell*, 436 U.S. at 690–94).

Mr. Sanguinetti fails to demonstrate any of the *Monell* elements. As discussed at length in this Order, Mr. Sanguinetti has not demonstrated that his constitutional rights were violated and, therefore, cannot establish *Monell* liability. Even if Mr. Sanguinetti had shown that his constitutional rights were violated, the claims still fail because he has not presented a plausible argument or evidence of *any* policies or customs for any of his § 1983 claims. Though the operative Complaint includes allegations of customs and policies, Mr. Sanguinetti's responses are completely devoid of any mention of a custom or policy—let alone any establishing evidence—despite the County and Sheriff's summary judgment argument on the issue. (*See* Doc. 149 at ¶¶ 65–66, 98–99, 225–44); (Docs. 180 at 21; 198; 200; 211). Because Mr. Sanguinetti failed to take up the argument at the summary judgment stage, the claims are abandoned. *See Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("In opposing a motion for

14

summary judgment, a party may not rely on his pleadings to avoid judgment against him . . . . [T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." (citation and internal quotation marks omitted)).  In any event, the Court cannot analyze the existence of a custom or policy when Mr. Sanguinetti has failed to present a supporting argument or evidence.[7]

Thus, Mr. Sanguinetti is left to establish a custom or policy only through a single interaction.  But "[a] single incident [is] not . . . so pervasive as to be a custom . . . because a custom must be . . . 'a longstanding and widespread practice. . . .'" *Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (quoting *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991)).  "A pattern of similar constitutional violations . . . is ordinarily necessary."  *Id.* (citation omitted).

Accordingly, the Court finds that summary judgment is due to be granted for counts IV, V, VII, XII, XIII, XIV, XV, and XVI to the extent that they are brought pursuant to § 1983 against the County or the Sheriff in his official capacity.  Counts XV and XVI are likewise due to be dismissed.

---

[7] It is the responsibility of the party to point the Court to record evidence of its arguments. *Atlanta Gas Light Co. v. UGI Utils., Inc.*, 463 F.3d 1201, 1208 n.11 (11th Cir. 2006) ("[T]he district court . . . has [no] obligation to parse a summary judgment record to search out facts or evidence not brought to the court's attention."); *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record[.]").  Notwithstanding, the Court has reviewed the record and finds that Plaintiff has not presented evidence of any customs or policies.

15

## II.   Mr. Sanguinetti has Failed to Show Lack of Probable Cause as to Counts II, III, IV, V, VIII, and IX.

Counts II, III, IV, V, VIII, and IX bring claims for false arrest, false imprisonment, and malicious prosecution under state law and § 1983.  Because probable cause resolves these claims, the Court turns first to whether Deputy Scaduto had probable cause to arrest Mr. Sanguinetti.

"[T]he correct legal standard to evaluate whether an officer had probable cause to seize a suspect is to 'ask whether a reasonable officer could conclude . . . that there was a substantial chance of criminal activity.'"[8] *Washington v. Howard*, 25 F.4th 891, 902 (11th Cir. 2022) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 61 (2018)).  Moreover, "an officer's subjective intent doesn't matter for 'ordinary, probable-cause Fourth Amendment analysis." *Crocker v. Beatty*, 995 F.3d 1232, 1244 (11th Cir. 2021) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)).  And "[w]hen an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest." *United States v. Saunders*, 476 F.2d 5, 7 (5th Cir. 1973) (citation omitted).

---

[8] The Eleventh Circuit previously utilized a higher standard for finding probable cause.  *See Washington*, 25 F.4th at 899 (finding that "[t]he older standard is more demanding than the *Wesby* standard" in that the older standard "requires facts and circumstances such that all prudent people would affirmatively believe that the suspect has already engaged in or will shortly engage in criminal behavior," whereas the *Wesby* standard "requires only that it be reasonable for any particular officer to conclude that there is a substantial chance of criminal activity") (internal citations and quotation marks omitted).

16

Here, Mr. Scaduto possessed probable cause to arrest Mr. Sanguinetti for, at a minimum, trespass. Under Florida law, a person commits the offense of trespass in a structure or conveyance when he "willfully enters or remains in any structure or conveyance" without having been "authorized, licensed, or invited," or refuses to leave after having been asked to do so by "a person authorized by the owner or lessee." Fla. Stat. § 810.08(1); *Watkins v. Dubreuil*, 820 F. App'x 940, 944 (11th Cir. 2020). Cavo Lounge employees asked Deputies Scaduto and Dillman to assist with removing Mr. Sanguinetti from the Cavo Lounge premises, and both Deputies observed Mr. Sanguinetti's interactions with the Cavo Lounge employees. (Doc. 179 at ¶¶ 11, 12; Doc. 180 at ¶ 11; Doc. 198 at ¶ 11; Doc. 199 at ¶ 11, 12). Indeed, Deputy Scaduto himself ordered Mr. Sanguinetti to vacate the premises of the Cavo Lounge.[9] (Doc. 179 at ¶ 32; Doc. 179-1 at 0:00:20–22). The Court therefore finds that Mr. Scaduto possessed probable cause to arrest Mr. Sanguinetti for trespass under Florida law.

Accordingly, Mr. Sanguinetti's Florida state law claims for false imprisonment and false arrest are defeated by probable cause. *See Bolanos v. Metro. Dade Cnty.*, 677 So. 2d 1005, 1005 (Fla. 3d DCA 1996) (probable cause bars a state claim for false arrest or false imprisonment); *DeMarie v. Jefferson Stores, Inc.*, 442 So. 2d 1014, 1016 n.1 (Fla. 3d DCA 1983) ("[T]he existence of probable cause is a part of the defense to a false arrest action which must be shown by the

---

[9] *See supra* n.4.

17

defendant." (citation omitted)).  Accordingly, defendants carry the burden of demonstrating the existence of probable cause as a defense to these claims.  *Rankin v. Evans*, 133 F.3d 1425, 1436 (11th Cir. 1998).[10]

Mr. Sanguinetti's claims of false imprisonment and false arrest under § 1983 likewise fail.  The sole difference in the analysis of Florida and federal claims for false arrest or false imprisonment is which party bears the burden of proving whether probable cause existed.  *Rankin*, 133 F.3d at 1436.  In § 1983 actions, it is the plaintiff's burden to show a lack of probable cause to succeed on claims for false arrest or false imprisonment.  *Id.*; *Evans v. Hightower*, 117 F.3d 1318, 1320 (11th Cir. 1997) ("In order to establish a Fourth Amendment violation, [plaintiff] must demonstrate that a seizure occurred and that it was unreasonable." (citation omitted)); *see also Rivas v. Freeman*, 940 F.2d 1491, 1496 (11th Cir. 1991) ("To successfully litigate a lawsuit for deprivation of constitutional rights under 42 U.S.C. § 1983, a plaintiff must show violation of a constitutionally protected liberty or property interest and deliberate indifference to constitutional rights." (citation omitted)).  This Court has found that there was probable cause to arrest Mr. Sanguinetti and, therefore, he cannot meet his burden of showing its absence.

Because there was probable cause to arrest Mr. Sanguinetti, his claims for malicious prosecution under Florida law and § 1983 are unsuccessful.  Under both

---

[10] In any event, these claims are barred because the officers involved in Mr. Sanguinetti's arrest, including Deputies Scaduto and Dillman, are entitled to the immunity set forth in section 768.28(9)(a), Florida Statutes.

state and federal law, a plaintiff bringing a malicious prosecution claim must demonstrate lack of probable cause. *See Burns v. GCC Beverages, Inc.*, 502 So. 2d 1217, 1218 (Fla. 1986) (explaining that the elements of malicious prosecution include: "(1) The commencement or continuance of an original criminal or civil judicial proceeding[;] (2) [i]ts legal causation by the present defendant against plaintiff who was defendant in the original proceeding[;] (3) [i]ts bona fide termination in favor of the present plaintiff[;] (4) **[t]he absence of probable cause for such proceeding**[;] (5) [t]he presence of malice therein[; and] (6) [d]amage conforming to legal standards resulting to plaintiff" (emphasis added) (citations omitted)); *Williams v. Aguirre*, 965 F.3d 1147, 1157 (11th Cir. 2020) (holding that a federal malicious prosecution claim requires proof "that the officers instituted or continued a criminal prosecution against him, with malice and **without probable cause**, that terminated in his favor and caused damage to him" (emphasis added) (citation and internal quotation marks omitted)).

## III.    Defendants are Entitled to Immunity on Counts VI and VII.

Counts VI and VII of Mr. Sanguinetti's Fourth Amended Complaint bring claims for battery under Florida law and excessive force pursuant to § 1983 against Defendants Scaduto, Dillman, Drucks, Puka, Cavo, and Tallides in their individual capacities. (Doc. 149 at 26–28). "A battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996) (citation omitted). This is a "similar standard" to that employed under the Fourth

19

Amendment. *See Sullivan v. City of Pembroke Pines*, 161 F. App'x 906, 911 (11th Cir. 2006) (per curiam). Indeed, "the elements and defenses of a battery claim against a law enforcement officer under Florida law are the same as those of an excessive force claim under the Fourth Amendment." *DaSilva v. Lamberti*, No. 08-62106, 2010 WL 680925, at *1 (S.D. Fla. Feb. 24, 2010). Accordingly, the Court analyzes these claims together.

Qualified immunity is an affirmative defense that protects government officials sued in their individual capacities from liability when: (1) they act within the scope of their discretionary authority, and (2) their conduct "violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Jordan v. Mosley*, 487 F.3d 1350, 1354 (11th Cir. 2007) (citations and quotation marks omitted). Qualified immunity balances two public interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Baker v. City of Madison, Ala.*, 67 F.4th 1268, 1278 (11th Cir. 2023) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)) (internal quotation marks omitted). "Entitlement to qualified immunity is for the court to decide as a matter of law." *Simmons v. Bradshaw*, 879 F.3d 1157, 1163 (11th Cir. 2018).

A "defendant asserting the qualified immunity defense bears the initial burden of showing that he or she was acting within his or her discretionary authority." *Myrick v. Fulton Cnty., Ga.*, 69 F.4th 1277, 1297 (11th Cir. 2023) (citing

20

*Piazza v. Jefferson Cnty.*, 923 F.3d 947, 951 (11th Cir. 2019)); *see also Storck v. City of Coral Springs*, 354 F.3d 1307, 1314 (11th Cir. 2003) ("Under qualified immunity analysis, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly unconstitutional acts took place."). Only after the defendant makes that showing does "the burden shift[ ] to the plaintiff to show that qualified immunity is not appropriate." *Myrick*, 69 F.4th at 1297 (citing *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)).

To determine whether a defendant acted within his discretionary authority, courts "assess whether [the actions] are of a type that fell within the employee's job responsibilities." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). Courts ask "whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Id.* at 1265–66.

If a defendant meets this burden, the burden shifts to the plaintiff to show that qualified immunity is inapplicable by demonstrating that (1) the deputies' conduct violated a constitutionally protected right and (2) that right was clearly established at the time of the misconduct. *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018) (citations omitted). "[T]he standard for determining if [a deputy] violated clearly established law is an objective one and does not include inquiry into the officer's subjective intent or beliefs." *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000) (citation omitted).

There is no question that Deputies Drucks, Crisp, Puka, Scaduto, and

21

Dillman were acting within their discretionary authority at the time of the altercation. Deputies Drucks, Crisp, and Puka were road patrol officers with the Collier County Sheriff's Office. (Doc. 173-9 at 3:12–4:3). On the evening of the events leading to this litigation, they were on assignment to patrol the Mercato area. (*Id.*; Doc. 179 at ¶ 41; Doc. 199 at ¶ 41). Their assignment consisted of patrolling and aiding bouncers within the area surrounding the Cavo Lounge. (Doc. 173-9 at 4:9–5:3). Deputies Drucks, Crisp, and Puka were all in uniform and on patrol in their assigned area when the altercation occurred. Deputies Scaduto and Dillman were detectives working in the gang unit of the Collier County Sheriff's Office. (Doc. 173-5 at 4:13–5:7; Doc. 180 at ¶ 4; Doc. 198 at ¶ 4). They were on patrol at Mercato that evening to provide a law enforcement presence following recent violent events in the area. (*Id.*). Similarly, Deputies Scaduto and Dillman were also in uniform and on patrol in their assigned area when the altercation occurred. Mr. Sanguinetti has failed to demonstrate that Sheriff Rambosk had any personal involvement in the altercation, but to the extent Mr. Sanguinetti alleges that Sheriff Rambosk was involved in his arrest, prosecution, or imprisonment, all such allegations clearly relate to acts that would be taken within Sheriff Rambosk's discretionary authority.

Because the officers were acting within their discretionary authority, the burden shifts to Mr. Sanguinetti to show that the officers are not entitled to qualified immunity. *See Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (holding that, for purposes of qualified immunity, it is the plaintiff's burden to show

22

that the defendant violated a constitutional right that was clearly established); *see also Jones v. Fransen*, 857 F.3d 843, 851 (11th Cir. 2017) ("[T]o survive a qualified-immunity defense, [the plaintiff] must satisfy *both* showings." (emphasis added)).

"A determination that an officer used excessive force 'requires careful attention to the facts and circumstances of each particular case' while 'recogniz[ing] that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" *Ingram v. Kubik*, 30 F.4th 1241, 1251 (11th Cir. 2022) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "Under that framework, the force used by an officer is reasonable only if it is 'reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer [or others], and the risk of flight.'" *Id.* (quoting *Lee*, 284 F.3d at 1198). The Court "also considers the need for application of force, the relationship between the need and amount of force used, and the extent of the injury inflicted by the arresting officer." *Id.* (quoting *Helm v. Rainbow City, Alabama*, 989 F.3d 1265, 1273 (11th Cir. 2021) (citation omitted)).

Here, Mr. Sanguinetti alleges Defendants used excessive force by "punch[ing], kick[ing] and str[iking]" him and excessively tightening the handcuffs. (Doc. 149 at ¶¶ 169–70). The force allegedly employed by Defendants in arresting Mr. Sanguinetti was reasonable under the circumstances, even when drawing all reasonable inferences in Mr. Sanguinetti's favor. While it is unclear from the record whether Mr. Sanguinetti indeed punched Deputy Dillman, the video evidence clearly demonstrates that, at a minimum, Mr. Sanguinetti's hands were raised

23

while facing officers at various points in time. (*See, e.g.,* Doc. 179-1 at 0:00:27–30; Doc. 180 at ¶ 15; Doc. 198 at ¶ 15). Mr. Sanguinetti is a large man who refused to vacate the premises when ordered to do so. (Doc. 173-3 at 17:23–18:9; Doc. 173-8 at 6:1–16; Doc. 179 at ¶¶ 47, 50; Doc. 180 at ¶ 16). Only after Mr. Sanguinetti refused to leave of his own accord did Deputy Dillman forcibly removed Mr. Sanguinetti from the line (Doc. 179 at ¶ 37; Doc. 179-1 at 0:00:27–29; Doc. 199 at ¶ 37) and take Mr. Sanguinetti to the ground (Doc. 179-1 at 0:00:29–31; Doc. 179 at ¶ 38; Doc. 199 at ¶ 38).

Once Mr. Sanguinetti was on the ground, he placed his hands under his body rather than behind his back. (Doc. 173-1 at 92; Doc. 179 at ¶ 39; Doc. 191 at ¶ 39). Deputy Dillman repeatedly warned Mr. Sanguinetti to stop resisting and informed him that they were police. (Doc. 173-5 at 22). Mr. Sanguinetti alleges that he did not hear these warnings. (Doc. 173-1 at 93).

Defendants employed the following measures of force in effectuating Mr. Sanguinetti's arrest: Deputy Dillman delivered strikes to Mr. Sanguinetti while the other officers attempted to get Mr. Sanguinetti's arms from underneath him (Doc. 179 at ¶ 54); Deputy Scaduto then delivered one burst of pepper spray to Mr. Sanguinetti's face (Doc. 179 at ¶ 55; Doc. 199 at ¶ 55); afterward, Deputy Scaduto deployed a single taser shot in prong mode while Mr. Sanguinetti was on the ground (Doc. 179 at ¶ 59; Doc. 199 at ¶ 59); when Mr. Sanguinetti stood up from the ground, Deputy Drucks took him back to the ground again (Doc. 179 at ¶¶ 61–62; Doc. 199 at ¶¶ 61–62); Deputy Dillman then attached a handcuff to one of Mr.

24

Sanguinetti's wrists (Doc. 179 at ¶ 64; Doc. 199 at ¶ 64) and twisted the attached handcuff in an effort to get Mr. Sanguinetti's other hand out (Doc. 179 at ¶ 65; Doc. 199 at ¶ 65). Once Mr. Sanguinetti was handcuffed, he was placed inside Deputy Crisp's vehicle. (Doc. 179 at ¶¶ 66–67; Doc. 199 at ¶¶ 66–67).

Though Mr. Sanguinetti contends that he was not resisting, he admits that he did not comply with the Defendants' attempts to handcuff his hands behind his back when he was on the ground, instead keeping his hands tucked underneath his body. (Doc. 173-1 at 92–93; Doc. 173-5 at 22). Further, once Mr. Sanguinetti was brought back down to the ground, the officers observed that his hands were again underneath his body and again attempted to pull his arms from underneath him to effectuate arrest. (*See* Doc. 173-4 at 25–26; Doc. 173-5 at 24–25). Mr. Sanguinetti again disputes that he was resisting but cannot recall whether his hands were underneath him or at his side at this point. (Doc. 173-1 at 101–02); *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("[U]nsupported speculation . . . does not meet a party's burden of producing some defense to a summary judgment motion. Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (citation omitted)).

Accepting as true Mr. Sanguinetti's version of the facts—that he kept his hands under him to protect himself from falling and did not hear the officers' demands to stop resisting—it is reasonable for Defendants to perceive such non-compliance as resistance. *See Prevatt v. City of Gainesville*, 657 F. App'x 905, 909

25

(11th Cir. 2016) (holding that the defendant officers were entitled to qualified immunity where they tackled the plaintiff to the ground after perceiving his delayed response to their commands to get on the ground as resistance even though the plaintiff had an arthritic leg).

"[A]n officer is entitled to qualified immunity from an excessive force claim unless application of the excessive force standard would inevitably lead *every reasonable official in the officer's position* to conclude the force was unlawful." *Jones v. City of Dothan, Ala.*, 121 F.3d 1456, 1460 (11th Cir. 1997) (cleaned up) (emphasis added).  Indeed, "force applied while the suspect has not given up and stopped resisting and may still pose a danger to the arresting officers, even when that force is severe, is not necessarily excessive." *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1356 (11th Cir. 2015); *see Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008) ("[I]n a difficult, tense and uncertain situation the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force." (citation and internal quotation marks omitted)); *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002) ("Courts have consistently concluded that using pepper spray is reasonable . . . where the plaintiff was . . . resisting arrest or refusing police requests . . . . Furthermore, as a means of imposing force, pepper spray is generally of limited intrusiveness, and it is designed to disable a suspect without causing permanent physical injury." (citation and internal quotation marks omitted)); *Rodriguez v. Farrell*, 280 F.3d 1341, 1352 (11th Cir. 2002) ("Painful handcuffing,

26

without more, is not excessive force in cases where the resulting injuries are minimal.").

Notably, no visible signs of serious injury were documented during Mr. Sanguinetti's jail intake medical screening, (Doc. 173-13 at 4; Doc. 179 at ¶ 71), and when asked whether Mr. Sanguinetti had a head injury or loss of consciousness in the past 72 hours, Mr. Sanguinetti answered, "No." (Doc. 173-13 at 5; Doc. 179 at ¶ 73; Doc. 199 at ¶ 73). While it is true that Mr. Sanguinetti's jail intake medical screening documented skin injury in the form of bruises and abrasions (Doc. 173-13 at 5; Doc. 179 at ¶ 74; Doc. 199 at ¶ 74) and that Mr. Sanguinetti complained of discomfort to his right thumb and numbness (Doc. 173-13 at 5; Doc. 179 at ¶ 72; Doc. 199 at ¶ 72), the photographic and videographic evidence of Mr. Sanguinetti after the altercation does not demonstrate any further injury (Doc. 179 at ¶ 75; Doc. 199 at ¶ 75; *see* Doc. 173-14). Mr. Sanguinetti does not allege that he subsequently sought medical treatment for any alleged injury. (Doc. 173-1 at 111). On these facts, the extent of Mr. Sanguinetti's injuries after the altercation further evidences that Defendants employed reasonable force under the circumstances. *See Nolin v. Isbell*, 207 F.3d 1253, 1258 n.4 (11th Cir. 2000) (holding that the officer did not use excessive force in handcuffing the appellee where he "had minor bruising which quickly disappeared without treatment."); *Pinto v. Rambosk*, No. 2:19-CV-551-JLB-MRM, 2021 WL 3406253, at *13 (M.D. Fla. Aug. 4, 2021) (finding no excessive force where the plaintiff "never sought medical treatment for his hands, and there [was] no evidence . . . of a lasting injury").

Even assuming, *arguendo*, that Mr. Sanguinetti successfully demonstrated a violation of a constitutional right, he cannot show that the right was clearly established. *See Jones* 857 F.3d at 851 ("[T]o survive a qualified-immunity defense, [the plaintiff] must satisfy *both* showings." (emphasis added)). "When we consider whether the law clearly established the relevant conduct as a constitutional violation at the time that Defendant Officers engaged in the challenged acts, we look for 'fair warning' to officers that the conduct at issue violated a constitutional right." *Id.*

A plaintiff may establish that an officer had fair warning in one of three ways. *Id.* at 852; *Gaines*, 871 F.3d at 1208. The plaintiff "may point to binding precedent that is materially similar." *Jones*, 857 F.3d at 852. While the Court "do[es] not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation omitted). Thus, the Court must "consider 'whether the factual scenario that the official faced is fairly distinguishable from the circumstances facing a government official in a previous case.'" *Jones*, 857 F.3d at 852 (quoting *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012)). Next, the plaintiffs may "point to a broader, clearly established principle that should control the novel facts of the situation." *Gaines*, 871 F.3d at 1208–09 (quoting *Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012)). Last, a plaintiff may establish that "the conduct involved . . . so obviously violate[s] the constitution that prior case law is unnecessary." *Id.* The second and third methods "are generally known as 'obvious

28

clarity' cases." *Gaines*, 871 F.3d at 1209. "They exist where the words of the federal statute or constitutional provision at issue are 'so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful.'" *Id.* (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002)).

Here, Mr. Sanguinetti relies on several cases he contends clearly establish that the officers' conduct violated his constitutional right. (Doc. 199 at 30–31) (citing *Cendan v. Trujillo*, 779 F. App'x 688, 690 (11th Cir. 2019) ("[T]his Court has repeatedly found it clearly established under the Fourth Amendment that officers may not use excessive force against a *non-resisting suspect who has already been subdued*." (emphasis added) (citation and internal quotation marks omitted)); *Quinette v. Reed*, 805 F. App'x 696, 704 (11th Cir. 2020) ("[A]pplying force on a *non-resisting* pretrial detainee violate[d] clear federal law." (emphasis added) (citation and internal quotation marks omitted)); *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) (holding the defendant officer violated a clearly established right where he "punched [the plaintiff] in the stomach while he was *handcuffed and not struggling or resisting*" emphasis added)).

A crucial factor in each case is that the plaintiff was not resisting. *Cendan*, 779 F. App'x at 690; *Quinette*, 805 F. App'x at 704; *Hadley*, 526 F.3d at 1330. Thus, the cases are significantly factually and legally distinguishable from this case. Nor can Mr. Sanguinetti demonstrate a clearly established right through the obvious clarity methods. Finding otherwise requires exceptionally rare circumstances that do not exist here. *See Santamorena v. Ga. Mil. Coll.*, 147 F.3d 1337, 1340 n.6 (11th

29

Cir. 1998) ("these exceptional cases rarely arise"); *Coffin v. Brandau*, 642 F.3d 999, 1015 (11th Cir. 2011) ("Our case law has made clear that 'obvious clarity' cases will be rare.").

## IV. Defendants are Entitled to Qualified Immunity on Count XIX.

Mr. Sanguinetti brings a claim for failure to intervene pursuant to § 1983 against Defendant Deputies Scaduto, Dillman, Drucks, Puka, and Crisp in their individual capacities. (Doc. 149 at 43–44). Specifically, Mr. Sanguinetti contends that the officers were present but did not prevent the allegedly unlawful conduct. (*Id.*).

This claim is barred by qualified immunity. Though "[a]n officer who is present and in a position to intervene to prevent another officer from violating the constitutional rights of an arrestee can be held liable for his inaction," there is no obligation to intervene where there was arguable probable cause for the arrest. *Quick v. Geddie*, 763 F. App'x 909, 915 (11th Cir. 2019) (holding the defendant officer was entitled to qualified immunity on plaintiff's failure to intervene claim where there was arguable probable cause for the arrest). It is well established that there was probable cause to arrest Mr. Sanguinetti and, further, that no excessive force was used to effectuate that arrest. *See Supra* Parts II, III. Accordingly, the officers had no obligation to intervene.

## V. Plaintiff's Equal Protection Claim Fails.

Count XII of the Fourth Amended Complaint is an equal protection claim brought under 42 U.S.C. § 1981 ("Section 1981") and Section 1983 against Sheriff

Rambosk and Deputies Scaduto and Dillman in their individual capacities, as well as against Collier County and Sheriff Rambosk in their official capacities.  (Doc. 149 at 34–35).

The elements of a cause of action for race discrimination under § 1981 are "(1) that the plaintiff is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute."  *Kinnon v. Arcoub Gopman & Assocs.*, 490 F.3d 886, 891 (11th Cir. 2007) (quoting *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1270 (11th Cir. 2004)).  Mr. Sanguinetti has not alleged that Defendants intentionally discriminated against him, nor has he offered any evidence of such intentional discrimination.

As such, the Motion for Summary Judgment filed by Deputies Scaduto, Drucks, Puka, and Crisp (Doc. 179) and the Motion for Summary Judgment filed by Collier County, Sheriff Rambosk, and Deputy Dillman (Doc. 180) are therefore **GRANTED** as to Count XII.

## VI.    Plaintiff's Claims for Negligent Supervision and Training Under Florida Law Fail.

Count XXI of the Fourth Amended Complaint is a claim for negligent supervision brought under Florida law against Collier County and Sheriff Rambosk in their official capacities.  (Doc. 149 at 45–47).  Count XXII of the Fourth Amended Complaint is a claim for negligent training brought under Florida law against Collier County and Sheriff Rambosk in their official capacities.  (Doc. 149 at 47–48).

Regarding Mr. Sanguinetti's negligent supervision claim, "under Florida law,

31

to state a claim for negligent supervision, the plaintiff must allege facts sufficient to show that once an employer received actual or constructive notice of problems with an employee's fitness, it was unreasonable for the employer not to investigate and take corrective action." *Inman v. Am. Paramount Fin.*, 517 F. App'x 744, 748 (11th Cir. 2013) (citation and internal quotation marks omitted); *see also Acts Ret.-Life Cmtys. Inc. v. Est. of Zimmer*, 206 So. 3d 112, 114 (Fla. 4th DCA 2016) ("[N]egligent supervision exists when the defendant negligently placed [the plaintiff] under the supervision of [an employee], when [the defendant] either knew or should have known that [the employee] had the propensity to commit [the torts alleged]." (cleaned up)).  For the claim to survive, the employer must have "become[ ] aware or should have become aware of problems with an employee that indicated his unfitness," and then "fail[ed] to take further actions such as investigation, discharge, or reassignment." *Dep't of Env't Prot. v. Hardy*, 907 So. 2d 655, 660 (Fla. 5th DCA 2005); *see also Harrison v. Red Bull Distib. Co.*, 2019 WL 1117022, at *2 (M.D. Fla. Mar. 11, 2019) (Steele, J.) ("[L]iability attaches when an employer (1) knows or should know about the offending employee's unfitness and (2) fails to take appropriate action.").  The plaintiff, then, must show both that the "employer received actual or constructive notice of problems with an employee's fitness" and that "it was unreasonable for the employer not to investigate or take corrective action." *Hardy*, 907 So. 2d at 660.  In other words, "[t]here must be a connection and foreseeability between the employee's employment history and the current tort committed by the employee." *Id.* at 661; *see also Malicki v. Doe*, 814 So. 2d 347, 362

32

(Fla. 2002) (noting that allegations that "the Church Defendants either knew or should have known that Malicki had the propensity to commit sexual assaults and molestations . . . are the classic elements of negligent hiring and negligent supervision claims").

As for Mr. Sanguinetti's negligent training claim, "[u]nder Florida law, an employer is liable in tort for reasonably foreseeable damages resulting from the negligent training of its employees and agents." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1265 (11th Cir. 2001). As with any negligence-based claim under Florida law, "a plaintiff must allege a duty of care owed by the defendant to the plaintiff, breach of that duty of care, and resulting damages." *Mosby v. Harrell*, 909 So. 2d 323, 327 (Fla. 1st DCA 2005); *see also Adler v. WestJet Airlines, Ltd.*, 31 F. Supp. 3d 1381, 1388 (S.D. Fla. July 8, 2014) (Cohn, J.) ("A plaintiff asserting a negligent training claim must allege that it was harmed as a result of an employer's failure to adequately train an employee, and that the nature of the employment put the plaintiff in a 'zone of risk' such that the employer had a duty running to the plaintiff." (citation omitted)).

Implicit in all this is a requirement that the employee engage in some tortious conduct. *See Footstar Corp. v. Doe*, 932 So. 2d 1272, 1278 (Fla. 2d DCA 2006) (Casanueva, J., concurring) (requiring the plaintiff to show that the employee engaged in "a tort which is recognized under common law"); *Gutman v. Quest Diagnostics Clinical Lab'ys., Inc.*, 707 F. Supp. 2d 1327, 1331–32 (S.D. Fla. Apr. 7, 2010) ("Defendants are correct that the underlying wrong for either claim [negligent

33

supervision or negligent training] must be a common law tort."). And the underlying tortious conduct must have "occurred outside the scope of the employee's employment." *Harrison*, 2019 WL 1117022, at *2; *see also Johnson v. Scott*, 2013 WL 5928931, at *6 (M.D. Fla. Nov. 1, 2013) ("A negligent hiring, retention, or supervision claim is allowed against an employer for acts of an employee committed outside the scope and course of employment." (citation omitted)); *Acts Ret.-Life*, 206 So. 3d at 115 ("Furthermore, it is also necessary that the actions of the employee be performed *outside* the scope of employment." (citation omitted)). Mr. Sanguinetti has failed to demonstrate that any of Sheriff Rambosk's or Collier County's employees engaged in tortious conduct outside the scope of their employment. As a result, these claims necessarily fail.

But Mr. Sanguinetti's decision to sue the State of Florida "or its agencies or subdivisions" for negligent training also implicates sovereign immunity issues. *See Gualtieri v. Bogle*, 343 So. 3d 1267, 1274 (Fla. 2d DCA 2022). Although the State of Florida has waived sovereign immunity "under circumstances in which the state or agency or subdivision, if a private person, would be liable to the claimant, in accordance with the general laws of the state," there is an exception to this broad waiver of sovereign immunity known as the "discretionary function exception." *Mosby*, 909 So. 2d at 326 (quoting Fla. Stat. § 768.28(1)); *see also Henderson v. Bowen*, 737 So. 2d 532, 534–35 (Fla. 1999) ("The State of Florida has waived sovereign immunity in tort actions for any act for which a private person under similar circumstances would be held liable.").

34

"Under the discretionary function exception, 'basic judgmental or discretionary governmental functions are immune from legal action, whereas operational acts are not protected by sovereign immunity.'" *Gualtieri*, 343 So. 3d at 1275 (quoting *Pollock v. Fla. Dep't of Highway Patrol*, 882 So. 2d 928, 933 (Fla. 2004)); *see also Lewis*, 260 F.3d at 1262–63 ("Accordingly, even if a plaintiff has adequately alleged all of the elements of a negligence claim, including the breach of a common law duty, immunity would still bar the claim if the challenged act were deemed to be governmentally 'discretionary' in nature, and not merely 'operational.'" (citing *Kaisner v. Kolb*, 543 So. 2d 732, 737 (Fla. 1989))).

A function is "discretionary" if it is an "exercise of executive or legislative power" that concerns "fundamental questions of policy and planning." *Gualtieri*, 343 So. 3d at 1275; *see also Lewis*, 260 F.3d at 1264–65 (same). In any event, Mr. Rambosk and Collier County are immune from state lawsuits alleging that they negligently trained police officers, as "decision[s] regarding how to train . . . officers and what subject matter to include in the training [are] clearly an exercise of government discretion regarding fundamental questions of policy and planning." *See Lewis*, 260 F.3d at 1266; *see also Whitaker v. Miami-Dade Cnty.*, 126 F. Supp. 3d 1313, 1330 (S.D. Fla. Feb. 20, 2015) (Lenard, J.) ("[U]nder Florida law, the County cannot be liable for failure to train and supervise because training and supervision are 'discretionary functions' for which governmental liability does not attach.").

For all of these reasons, the Motion for Summary Judgment filed by Collier

County, Sheriff Rambosk, and Deputy Dillman (Doc. 180) is therefore **GRANTED** as to Counts XXI and XXII.

**CONCLUSION**

For the reasons set forth above, it is **ORDERED:**

1. The Clerk of Court is hereby **DIRECTED** to **STRIKE** Mr. Sanguinetti's Notice of Clarification (Doc. 202).

2. The Motion for Summary Judgment filed by Defendants Scaduto, Drucks, Puka, and Crisp (Doc. 179) is **GRANTED**.

3. The Motion for Summary Judgment filed by Defendants Collier County, Sheriff Rambosk, and Deputy Dillman (Doc. 180) is **GRANTED**.

4. The Clerk of Court is **DIRECTED** to enter judgment accordingly, terminate all pending motions and deadlines, and close this case.

**ORDERED** in Fort Myers, Florida, on February 20, 2026.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE